## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

**THE OUTDOOR CHANNEL, INC.,**

        **Plaintiff,**

**v.**

**PERFORMANCE ONE MEDIA, LLC, d/b/a**
**IN COUNTRY TELEVISION, a New York Limited**
**Liability Company; and ROBERT J. SIGG, an**
**individual,**

        **Defendants.**

**Case No. 10-CV-30-JHP-PJC**

### OPINION & ORDER

Before the court is the Motion to Dismiss for Lack of Jurisdiction under Fed. R. Civ. P. 12(b)(2) (lack of personal jurisdiction) filed by Defendants Performance One Media, LLC ("POM") and Robert J. Sigg ("Mr. Sigg"). Docket No. 22 (hereinafter "Motion to Dismiss"). This motion has been pending more than one year due to multiple requests to stay the case pending discovery on the issue of personal jurisdiction, followed by a highly contested discovery dispute regarding that very discovery. Both parties have repeatedly supplemented their arguments. *See* Docket Nos. 27, 73, 79, 87, 165 (Plaintiff's Response, supplements thereto, and final argument); Docket Nos. 39, 93, 113, 164, 173 (Defendant's Reply, supplements thereto, submission of supplemental authority, and final argument). Oral argument on the Motion to Dismiss was held May 25, 2011. Docket No. 169.

Additionally, Plaintiff The Outdoor Channel, Inc. ("Outdoor Channel," "Plaintiff") also has two motions before the court: Plaintiff's Opposed Motion to Amend, which is fully briefed (*see* Docket Nos. 51, 52), and Plaintiff's Sealed Motion for Sanctions Against Defendants Concerning Jurisdiction Issues, which is also fully briefed (*see* Docket Nos. 177, 181, 183).

For the reasons cited herein, Defendants' Motion to Dismiss is GRANTED, the Plaintiff's Motion to Amend is MOOT, and Plaintiff's Motion for Sanctions is DENIED.

BACKGROUND

Plaintiff Outdoor Channel, a Nevada Corporation having a principal place of business in California, brings suit against two defendants: Performance One Media, LLC, doing business as In Country Television ("POM"), and Robert Sigg, the president of POM.  POM is a New York limited liability company with its principal place of business in Colorado.  Sigg, an individual, resides in Colorado.

Outdoor Channel sued POM and Sigg for trademark infringement.[1]  Shortly after this case was filed, Defendants filed their Motion to Dismiss for lack of personal jurisdiction.  As in most such jurisdictional disputes, Defendants argue that they have no significant contact with Oklahoma such that they could reasonably be held to respond to a lawsuit in this state.  Plaintiffs have responded by presenting evidence of Defendants' contacts with the state of Oklahoma.

---

[1] The following chart denotes the trademarks held or claimed by Outdoor Channel and the allegedly infringing marks used by POM.  These facts are not dispositive to the issue of personal jurisdiction, but provide valuable background information regarding Outdoor Channel's claim.

| TRADEMARK HELD OR CLAIMED BY OUTDOOR CHANNEL | MARKS USED BY POM ALLEGED TO BE INFRINGING | HOW MARK WAS USED BY POM |
|---|---|---|
| Trademark:  "THE OUTDOOR CHANNEL" design element<br><br>Slogan: "BRING THE OUTDOORS HOME"<br><br>(registered trademarks) | Slogan: "IN COUNTRY TELEVISION Bringing the Outdoors Home" with design element<br><br>Show title: "OUTDOORS TV" | Slogan and element: Displayed on internet and in written correspondence.<br><br>Show title: Broadcast via satellite networks. |
| Show title: "THE WINGSHOOTER" (registered trademark) | Show title: "WINGSHOOTER USA" | Broadcast via satellite networks. |
| Trade dress of Outdoor Channel's website – consisting of black background and large video highlights prominently displayed, among other things | ICTV website, appearing to have a black background and displaying video highlights, among other similarities | Displayed on internet. |

*See generally* Amended Complaint, Docket No. 9.

2

Thus, the issue presented is whether Defendants' contacts with Oklahoma are sufficient to justify an Oklahoma court exercising jurisdiction over them.

Initially, the court notes that Defendants are not licensed to do business in Oklahoma, do not maintain an office or employ any personnel in Oklahoma, and have no assets, bank accounts, or real or personal property in Oklahoma.

It is undisputed that the allegedly infringing trademarks utilized by POM have appeared on In Country Television's ("ICTV's") television programming and website. ICTV's television programming is broadcast nationally via satellite networks maintained by DISH Network ("DISH") and DirecTV. Thus, DISH Network and DirecTV subscribers in Oklahoma can view allegedly infringing trademarks appearing on the programming. POM's contracts with both DISH and DirecTV for the nationwide broadcast of ICTV do not specifically reference Oklahoma. Instead, both contracts reflect the understanding that ICTV programming was to be distributed to the entire United States.[2] Evidence presented to the court also demonstrates that POM and DirecTV executed a contract in March 2009 for the distribution of "Performance Television," a product of POM that is separate from ICTV and therefore not a source of infringement with regard to Outdoor Channel's allegations of trademark infringement.[3]

---

[2] The contracts were filed under seal and appear in the record as Docket Nos. 165-1 (DirecTV) and 165-2 (DISH Network). The DirecTV contract provides that "Programmer hereby grants to [DirecTV] the non-exclusive right to distribute the Service *in the United States, its territories and possessions* (the "**Territory**") via the DirecTV Distribution System to DirecTV subscribers . . ." (Docket No. 165-1, ¶ 1.2.1) (italics supplied; bold original); "[DirecTV] shall distribute the Service in its most highly penetrated package of programming" (*id.* ¶ 4.1); and the contracting parties agree that DirecTV "shall distribute the Service in the Territory in accordance with . . . this Agreement" (*id.* ¶ 5.1.3). Oklahoma is not specifically mentioned in the contract. The DISH Network contract provides that POM "grants to DISH . . . the non-exclusive right and license . . . to distribute the Service in the Territory, via the Distribution System for viewing, exhibition and display by Service Subscribers . . ." Docket No. 165-2, ¶ 3(a). "Territory" is defined as "the United States, its territories, commonwealths and possessions, including without limitation the District of Columbia, Puerto Rico and the United States Virgin Islands." *Id.* ¶ 1(s). DISH Network also agreed to distribute ICTV within its basic package of programming. *See id.* ¶ 5(b). The DISH Network contract does not specify Oklahoma as a destination of programming.

[3] *See* Plaintiff's Motion for Sanctions at 1-2, Docket No. 177; Defendant's Response to Motion for Sanctions at 7-8. This fact was alluded to in oral argument and directly discussed in Plaintiff's Motion for Sanctions. Plaintiff argues that this information is relevant and was untimely produced by Defendant. Because it appears that the parties agree

ICTV programming includes "infomercials," which may produce profits or sales "leads" for the advertising party.  Pursuant to POM's contracts with these third-party advertisers, POM may receive a percentage of profits derived from the advertising included in ICTV programming, or may also derive profits when infomercials produce sales "leads."  It is undisputed that a portion of the profits and/or leads created by infomercials appearing on ICTV potentially come from Oklahoma, and for purposes of this motion the court will assume that a portion of the profits was derived from Oklahoma residents.  Evidence shows that POM's other channel, "Performance Television" may have also derived profits sales or "leads" resulting from "infomercials" appearing on Performance Television, a portion of which also could have come from consumers in Oklahoma.

ICTV operates a website which can be viewed by anyone with access to the internet.  The allegedly infringing marks and trade dress can therefore be viewed in Oklahoma via the internet. The website contains a link through which interested customers that do not have access to ICTV programming can contact POM and request its programming in their area.  There is evidence that through this website function, ICTV received communication from Oklahoma residents requesting services, and in at least one instance, ICTV responded to an Oklahoma resident with instructions for how to request ICTV service from his satellite network provider.  There is also evidence that the National Reining Horse Association ("NRHA"), an Oklahoma-based entity with which POM contracted to provide entertainment programming on ICTV, initially contacted POM through the ICTV website "about the possibility of NRHA doing business with [POM]." *See* Affidavit of Todd Barden ¶ 5, Docket No. 73-1, Exh. E.

---

that POM had a distribution agreement for the broadcast of "Performance Television" by DirecTV in 2009, that fact will be considered in the Motion to Dismiss.  The Motion for Sanctions alleging Defendant's untimely production of this evidence is addressed *infra* Part III.

The website also displays country-area real estate listings from across the United States, including a significant number of real properties in Oklahoma.  Persons interested in the real estate listings can follow links to view additional information.  Third-party company Lands of America, LLC, a Texas-based company, provided the content of the listings.  Though POM's contract with Lands of America provided potential for POM to receive revenue from real estate listings, it appears no revenue was ever received from real estate listings on ICTV's website.  *See* Plaintiff's Third Supplement to Response to Motion to Dismiss, Exh. R at 143, 147-52, Docket No. 88; Plaintiff's Fourth Supplement to Response to Motion to Dismiss, Exh. F., Docket No. 167-2 at 30-31.

Finally, Plaintiffs have submitted evidence that POM has ongoing business relationships with at least six Oklahoma-based entities, including the NRHA, BuckVentures, "Hunt, Sleep, Fish Outdoors," Jimmy Houston Adventures, and Hooked on Fishin'.  POM maintained contractual relationships with these entities, which produced television programming aired on ICTV.  With regard to all of the entities, it appears that POM/ICTV regularly sent invoices to Oklahoma, and in response to these invoices, was paid by these Oklahoma entities with money drawn from an Oklahoma bank account.  With regard to NRHA, which operates in Oklahoma City, the evidence shows that after receiving an initial contact from NRHA, POM sent targeted marketing materials and a contract for signature to NRHA in Oklahoma, some pages of which contained two of the allegedly infringing marks at issue in this lawsuit.[4]  *See* Supplement to Response to Motion to Dismiss, Exh. E, Docket No. 78-1, pp. 68-101 (exhibit includes affidavit of NRHA Director of Marketing and Communications, NRHA contract, and invoices); Second

---

[4] The communications include two allegedly infringing marks: the stylized mountain design element and the slogan. *See, e.g.,* Supplement to Response to Motion to Dismiss, Exh. E, Docket No. 78-1 at 72, 75; Second Supplement to Response to Motion to Dismiss, Exh. K, Docket No. 80-1 at 8-16 (ICTV proposal for NRHA partnership, displaying allegedly infringing marks of mountain design element and slogan).

Supplement to Response to Motion to Dismiss, Exh. K, Docket No. 80-1 at 8-16 (ICTV proposal for partnership with NRHA).

After the parties completed briefing on the Motion to Dismiss, Plaintiff's counsel filed a Motion for Sanctions against Defendants, alleging that Defendants concealed relevant discoverable material, and failed to abide by court order in connection with the production of those documents.  Plaintiffs requested that as a result of this misconduct, the court deny Defendant's Motion to Dismiss and order Defendants to pay all of Plaintiff's fees and costs incurred in connection with the Motion to Dismiss.  Defendants oppose the motion, and the issue is now fully briefed.  This motion will be addressed in Part III, *infra*.

## DISCUSSION

I.      Defendant's Motion to Dismiss for Lack of Personal Jurisdiction

The purpose of allowing a jurisdictional challenge such as the one raised here is to protect a defendant who has no meaningful contact with a state from being forced to litigate in an unfamiliar and potentially unfair forum.  OMI Holdings, Inc. v. Royal Ins. Co. of Canada, 149 F.3d 1086, 1090 (10th Cir. 1998).  Where, as here, the Court determines that an evidentiary hearing is not necessary,[5] the plaintiff must only make a *prima facie* showing that jurisdiction is appropriate in order to overcome such challenge.  *Id.* at 1091.  The defendant must then present a compelling case that the exercise of jurisdiction would somehow be unreasonable.  *Id.*  At this early stage of litigation, the plaintiff's burden is light, and all doubts must be resolved in plaintiff's favor.  Intercon, Inc. v. Bell Atlantic Internet Solutions, Inc., 205 F.3d 1244, 1247 (10th Cir. 2000).

---

[5]The court held a hearing in this case, but it was a motion hearing for the purpose of oral argument only.  *See* Docket Nos. 116, 169.

To establish personal jurisdiction over the defendants, the "plaintiff must show that jurisdiction is proper under the laws of the forum state and that the exercise of jurisdiction would not offend due process." *Id.* "Because Oklahoma's long-arm statute permits any exercise of jurisdiction consistent with the U.S. Constitution, the personal jurisdiction inquiry . . . collapses into a single due process inquiry." *Id.* Due process requires "only that in order to subject a defendant to a judgment *in personam*, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)). The existence of such minimum contacts must support the exercise of either specific or general contacts-based personal jurisdiction. In this case, Outdoor Channel argues that Defendants are subject to both general and specific jurisdiction.[6]

Specific contacts-based jurisdiction requires that "the defendant's conduct and connection with the forum state are such that he should reasonably anticipate being hailed into court there." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980). If specific minimum contacts exist, the court must determine whether "the exercise of personal jurisdiction over the defendant offends 'traditional notions of fair play and substantial justice.'" *OMI Holdings*, 149 F.3d at 1091 (quoting Asahi Metal Indus. Co. v. Superior Court of California, 480 U.S. 102, 113 (1987)). Then, if specific-contacts based jurisdiction is not found to exist in a case, a court must also determine whether general contacts-based jurisdiction exists. "Because general jurisdiction is not related to the events giving rise to the suit, courts impose a more

---

[6] The record before the court demonstrates that there is no potential basis for personal jurisdiction over the defendants in Oklahoma other than their contacts with this forum: neither defendant is a citizen of Oklahoma, Defendants have clearly not consented to personal jurisdiction in this state, and Defendants were not served inside Oklahoma because Defendants waived service of process (*see* Docket Nos. 10-13).

stringent minimum contacts test, requiring the plaintiff to demonstrate the defendant's continuous and systematic general business contacts."  Benton v. Cameco Corp., 375 F.3d 1070, 1080 (10th Cir. 2004) (citing *OMI Holdings*, 149 F.3d at 1091)).  The court will proceed by analyzing first whether it has personal jurisdiction over POM, then considering whether it has personal jurisdiction over Sigg.

     A.     Personal Jurisdiction over Defendant POM

        1.     Relevant Contacts

Plaintiff has alleged a number of "contacts" between POM and the state of Oklahoma. The contacts which must be analyzed are:

     a.     The nationwide broadcast of ICTV and Performance Television programming via the DirecTV and DISH satellite systems that reaches DirecTV and DISH subscribers in Oklahoma, the ICTV programming having displayed some of the allegedly infringing marks;

     b.     POM's receipt of revenue from third-party advertisers who complete the sale of advertised products or receive "leads" as a result of infomercials placed on ICTV and Performance Television;

     c.     POM's maintenance of the ICTV website that displayed some of the allegedly infringing marks and the allegedly infringing trade dress, which was accessible by persons in Oklahoma;

     d.     POM's execution of contracts with as many as seven Oklahoma entities, through which POM has received programming made in Oklahoma, sent invoices to Oklahoma, and received payment drawn from Oklahoma bank accounts;[7]

---

[7] Each contract falling into this category is different.  Under some, like that with the National Reining Horse Association, the contracts created an ongoing relationship.  Most of these contracts were for the provision of

e.      The correspondence and contract between POM and the NRHA, which were sent into Oklahoma by POM, of which a number of the pages therein contained allegedly infringing marks.

*See supra* "Background" section.

2.      Specific Jurisdiction[8]

When analyzing a group of contacts to determine whether specific contacts-based personal jurisdiction exists, a court first addresses whether the defendant has any contacts with the state in question.  The test for whether a contact is sufficient to establish "specific" jurisdiction is two-fold: "first . . . the out-of-state defendant must have 'purposefully directed' its activities at residents of the forum state, and second . . . the plaintiff's injuries must 'arise out of' defendant's forum-related activities."  Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d 1063, 1071 (10th Cir. 2008) (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985)).  The purpose of the "purposeful direction" component is "to ensure that an out-of-state defendant is not bound to appear to account for merely 'random, fortuitous, or attenuated contacts' with the forum state."  *Dudnikov*, 514 F.3d at 1072 (quoting *Burger King*, 471 U.S. at 472).  The "arise out of" factor requires there be a causal connection between the defendant's activities in the forum and the lawsuit.  *See id.* at 1078.  The court will now apply this two-pronged test to determine whether POM's contacts to the state of Oklahoma provide a basis for specific jurisdiction.

a.   Minimum Contacts

---

programming for ICTV by the Oklahoma entities.
[8] It is undisputed that any "contact" established through POM's 2009 contract with DirecTV for the distribution of Performance Television does not pertain to specific jurisdiction, because Performance Television did not contain any of the allegedly infringing marks.  Therefore, the contact made as a result of this contract, if any, will not be discussed in this section, but in the general jurisdiction section, *infra* Part I.A.3.  The court notes however, that to the extent the basic analysis adopted in this section with regard to purposeful direction of a nationwide broadcast is applicable to the Performance Television contract, such analysis will be incorporated below.  *See infra* note 22.

(i)    Television Broadcast

First, the court finds POM has not "purposely availed itself of the privilege of conducting business in Oklahoma" by way of its contracts with DISH and DirecTV for the national broadcast of ICTV programming.  At the outset, the court notes that Oklahoma is never specifically mentioned as a targeted area by either contract.  Instead, both contracts generally specify the "United States," and certain territories thereof, as the territory covered by the broadcast.  While Plaintiff contends that it would have been a breach of contract for DISH or DirecTV to *not* broadcast ICTV to its subscribers in Oklahoma, there is no evidence that such a selective broadcast was considered or is even possible.  Plaintiff notes that both contracts specified that ICTV would be broadcast in the most basic channel range, thereby allowing the channel to reach the largest subscriber base, then argues that term demonstrates POM intended to target the largest possible audience.  The court agrees with this statement, however it provides no evidence that POM specifically targeted Oklahoma residents more than residents of any other state.  What it demonstrates is that POM desired the largest possible *national* audience.  Finally, Plaintiff argues that, pursuant to one term in the DISH Network agreement,[9] POM has agreed to subject itself to the laws of Oklahoma.  The court also agrees with this statement, however the contractual term specifies that POM will abide by the laws of "any portion" of the United States, not of Oklahoma specifically, such that in effect POM has agreed to abide by the laws of every state with regard to the broadcast of obscenity, libel, slander, or the intellectual property of another.  *See supra* note 9.  There is simply nothing in the contract which specifically directs

---

[9] DISH Affiliate Agreement ¶ 8(b)(vii): "[ICTV programming] will not contain any material which is obscene, libelous, slanderous, indecent or defamatory, nor will it contain any material which violates or infringes any copyright, trademark, right of privacy or literary or dramatic right or any other right of any person or entity pursuant to the Law of the United States and/or to the Territory *or any portion thereof*." (emphasis supplied).

ICTV programming to Oklahoma or demonstrates that POM purposely directed its activities to Oklahoma.

The court's analysis on this issue is buttressed by analogous case law cited by Defendants. In *Auto Channel, Inc. v. Speedvision Network*, Plaintiffs, owners of a television channel, sued defendants, owners of a competing television channel, on both intellectual property grounds (trade secret) and state law grounds. 995 F. Supp. 761, 762, 766 (W.D. Ky. 1997). Plaintiffs brought suit in their home state of Kentucky even though evidence demonstrated that defendants had no offices, employees, or agents in Kentucky. *See id.* at 763-64. In response to Defendants' motion to dismiss for lack of personal jurisdiction, Plaintiffs argued that personal jurisdiction could be premised on the fact that Speedvision Network licensed its content to cable and satellite distributors such as HBO Direct and DirecTV, which in turn broadcast the Speedvision Network programming to their subscribers, including Kentucky residents. *Id.* at 764-65. The court found this fact irrelevant to the jurisdictional analysis, stating, "Speedvision sells no programming directly to television viewers in Kentucky . . .". *Id.* at 765. The court concluded that "one cannot escape the impression that neither Speedvision nor [its co-defendant] have acted purposefully within the state in any consequential manner." For substantially the same reasons, this court concludes that POM's transmission of ICTV programming to DirecTV and DISH Network, who then broadcast that signal to the entire United States, pursuant to contract, does not demonstrate that POM "purposefully directed its activities" at residents of Oklahoma.[10][11]

---

[10] Though it analyzed a nationwide dispersal of information over a different medium (the internet), the court finds the reasoning in *Bensusan Rest. Corp. v. King*, 937 F. Supp. 295, 301 (S.D.N.Y. 1996), *aff'd*, 126 F.3d 25 (2d Cir. 1997), analogous and supportive. In *Bensusan*, the issue was whether a Missouri resident could be sued in New York for trademark infringement after he created a generally accessible and passive website that gave information about a jazz club he owned and operated in Missouri. *See generally id.* The court found that the defendant had "done nothing to purposefully avail himself of the benefits of New York. [Defendant], like numerous others, simply created a Web site and permitted anyone who could find it to access it. Creating a site, like placing a product into

Moreover, assuming strictly for the purpose of argument that the nationwide broadcast of ICTV by DirecTV and DISH constituted a purposeful direction of POM's activities to Oklahoma, the court finds that the second prong of the minimum contacts test is attenuated at best. The second prong requires the plaintiff's claim arise out of or result from the defendant's actions such that a causal connection with the forum state is created. *See Dudnikov*, 514 F.3d at 1078. Though the cause of action can arguably be said to have generally arisen out of POM's use of allegedly infringing marks in ICTV programming, that use does not create a causal connection to Oklahoma when the use of infringing mark was broadcast nationally and not specifically targeted at Oklahoma residents. Reasoning from *Auto Channel* is again applicable:

> In this case, the statutorily required relationship between Plaintiffs' tort claims and Defendants' minimal contacts to Kentucky is so attenuated as to be *de minimus*. The only possible link is that some Kentucky customers of Primestar, HBO Direct, or DirecTV may be subscribing to Speedvision, the network that Defendants allegedly copied from the Auto Channel. However, this slight degree of relatedness is not sufficient to support personal jurisdiction over the Defendants.

---

the stream of commerce, may be felt nationwide-or even worldwide-but, without more, it is not an act purposefully directed toward the forum state." *Id.* at 301. This analysis is generally instructive in the instant case, in which DirectTV and DISH have made POM's ICTV programming available nationwide, but POM has not targeted its activities to Oklahoma.

[11] Plaintiff has produced evidence that demonstrates that in at least one instance, a POM representative responded to a request for assistance with reception of the ICTV channel through DirecTV. The request was submitted via a page on the ICTV website maintained by POM, whereby visitors could request information from POM representatives. *See* Oral Argument Exh. 7. The POM representative instructed the Oklahoma resident that, "If you aren't able to see it. You [*sic*] need to upgrade your DirecTV equipment. They may tell you they don't offer the channel, but insist you know it's there and ask to speak with a supervisor until you get a customer service rep that can help you." *Id.* It is clear from this communication that the POM representative instructed the Oklahoman to contact DirecTV, demonstrating that POM did not control the signal and reception of ICTV programming in Oklahoma. While POM did indeed assist this Oklahoma resident in the reception of ICTV programming, it was merely to provide further information about the DirecTV signal. Moreover, this evidence shows that POM was restricted to operating through the third party, DirecTV, who controlled the signal entering Oklahoma. The court also notes that the communications between the POM representative and the Oklahoma resident did not contain the allegedly infringing material. *See id.* It is difficult to conclude that through this action POM "purposely directed its [trademark infringement] activities at residents of [Oklahoma]." Even if it could be concluded that this action constituted purposeful direction by POM, the court finds that this contact is too attenuated to overcome its conclusion that asserting personal jurisdiction over POM in Oklahoma in this action violates the traditional notions of fair play and substantial justice. *See infra* Part I.A.2.b. POM's internet activities are addressed *infra* Part I.A.2.a(iii).

12

*Auto Channel*, 995 F. Supp. at 766.  The court agrees with the reasoning in *Auto Channel* and finds it applicable to this case: any connection to Oklahoma established by DISH and DirecTV's nationwide broadcast of ICTV is so attenuated that it is insufficient to satisfy either a but-for causation test or a proximate causation test.  *See Dudnikov*, 514 F.3d 1078 (declining to adopt either but-for causation or proximate causation as the Tenth Circuit's standard for interpreting the "arise out of" prong for specific contacts; finding that facts in that case satisfied either test, including the more rigorous proximate cause standard).  The court therefore concludes that the national broadcast of ICTV via DISH Network and DirecTV does not constitute a relevant contact for purposes the personal jurisdiction analysis.[12]

### (ii)    "Infomercial" Revenue

Second, the court likewise concludes that POM's receipt of revenue as a result of advertising placed by third-parties on ICTV is not a relevant contact for purposes of personal jurisdiction analysis.  The evidence demonstrates that POM contracted with third-party advertisers to place "infomercials" on ICTV, and that, as a form of payment, ICTV may receive income based on a percentage of sales or number of "leads" generated by each infomercial.

---

[12] Plaintiff cites to *Indianapolis Colts, Inc. v. Metro. Baltimore Football Club L.P.*, 34 F.3d 410, 412 (7th Cir. 1994), among others (*see* Response at 8-9, Docket No. 27) for the proposition that the television broadcast of programming into an area, where the broadcast itself brings about the cause of action, is sufficient basis for personal jurisdiction over the infringer. The case does not stand for this overbroad proposition.  The *Indianapolis Colts* court highlighted the fact that in most cases in which personal jurisdiction over a defendant in a suit involving intellectual property was upheld, the defendant both "brought about an injury to an interest *located in a particular state*," and "entered" that state in some fashion.  Thus, *Indianapolis Colts* held the broadcast of a trademark into the state where the harm was concentrated (in this case, Indiana), was sufficient to satisfy the "entry into the state" prong of the personal jurisdiction in an intellectual property case, as distribution of defamatory material in a magazine in California sufficed to establish the "entry into the state" prong for personal jurisdiction in the plaintiff's home state of California in *Calder v. Jones*.  *See* 34 F.3d at 412 (citing 465 U.S. 783 (1984)).  While the Plaintiff in this case has demonstrated that the allegedly infringing marks used by POM were broadcast into Oklahoma, there is no evidence showing that the harm was particularly located in Oklahoma.  Thus, the holding in *Indianapolis Colts* is inapplicable because Plaintiff did not sue in the state where the harm was focused.  *Indianapolis Colts* therefore does not support Plaintiff's argument that the mere broadcast of allegedly infringing marks into a forum state is sufficient to establish personal jurisdiction over the defendant.

There is no evidence that any of these third-party advertisers were Oklahoma entities.[13]  Though it is possible that Oklahoma residents constituted a portion of the sales or "leads" generated by the commercials, that factor alone cannot establish that POM "purposely directed" its activities to Oklahoma.  The third-party advertisers are the parties that established direct contacts with Oklahoma residents by way of their infomercials and product sales.  POM has not established such a direct contact.  POM does not directly receive revenue from residents of Oklahoma, but from the third-party advertisers, who remit payment based on the number of sales or leads generated *nationally*.  It simply cannot be determined that POM targeted Oklahoma residents by way of their infomercial revenue from third-party advertisers who advertised to a national market.

Moreover, assuming that POM *had* purposely directed its activities toward Oklahoma, the court finds that, for purposes of specific jurisdiction, Plaintiff's cause of action cannot be said to have "arisen out of" POM's display of infomercials on ICTV because there does not appear to be any evidence demonstrating that the allegedly infringing trademarks were displayed during the infomercials.  Simply put, these real estate listings do not establish a "contact" between POM and Oklahoma. [14]

---

[13] *See, e.g.*, Tr. of Oral Argument at 38-42, Docket No. 176 (Plaintiff's argument does not contain any allegation that third-party advertisers are Oklahoma entities).  The court finds that even if one of these third-party advertisers is an Oklahoma entity, this "contact" is irrelevant for purposes of specific jurisdiction, because there is no allegation that the allegedly infringing trademarks appeared in the infomercial broadcast.  *See* discussion *infra*.

[14] This analysis is also applicable to the real estate listings maintained for a time on ICTV's website.  *See supra* BACKGROUND.  Plaintiff appears to allege that because a number of the listings were for Oklahoma real property, POM has established a "contact" with Oklahoma.  This is not borne out by the evidence.  The party that provided the content for the real estate listings, Lands of America, LLC, is a Texas-based company.  POM entered into a contract with the Texas-based Lands of America, and had potential to receive revenue from the real estate listings based on a proportion of the cost of the listing that appeared on the ICTV website.  *See* Plaintiff's Third Supplement to Response to Motion to Dismiss, Exh. R at 147-52, Docket No. 88.  Like the revenue received from the infomercials, any potential revenue derived from the Oklahoma real estate listings was not received directly from Oklahoma residents, but pursuant to POM's contract with Lands of America.  There is no evidence that through this contract POM purposefully directed its activities toward Oklahoma residents.  Also, there is no evidence that any of the allegedly infringing marks appeared in the real-estate listings section of the ICTV website, so the Plaintiff's cause of action cannot be said to have "arisen out of" the Oklahoma real estate listings described here.  These listings simply

(iii)    ICTV's Website

The third alleged contact to be analyzed is POM's maintenance of the ICTV website that displayed the allegedly infringing marks and trade dress.  The website could be viewed by internet users worldwide, including users in Oklahoma.  There is no evidence that POM solicited monetary transactions or sold products or services through the ICTV website.  The ICTV website contained a "contact us" link whereby persons visiting the website could contact ICTV via email and request assistance receiving ICTV programming.  A number of Oklahomans contacted POM through this link on ICTV's website, and a POM representative responded to at least one Oklahoman's inquiry with instructions for how to receive ICTV programming.  *See supra* note 11.[15]

The law is evolving on the issue of whether a defendant's website presence in the forum state is sufficient to establish personal jurisdiction.  A frequently cited case in this area is *Zippo Manufacturing Co. v. Zippo Dot Com*, in which the court acknowledged the wide "spectrum" of interactivity available with websites and utilized a website's interactivity as a guide for whether it constitutes a "contact" with the forum state.

> At one end of the spectrum are situations where a defendant clearly does business over the Internet.  If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper.   At the opposite end are situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions.  A passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise personal [*sic*] jurisdiction.  The middle ground is occupied by interactive Web sites where a user can exchange information with the host computer.   In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site.

---

do not establish a "contact" between POM and Oklahoma.
[15] The ICTV website also listed real estate for sale across the nation, including properties located in Oklahoma.  This fact issue is discussed, *supra* note 14, and dismissed as irrelevant for purposes of this jurisdictional analysis. Therefore, it will not be further discussed in this section regarding the interactivity of ICTV's website.

*Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997).

The Tenth Circuit has not expressly adopted the *Zippo* sliding-scale test for internet jurisdictional analysis.  *See* Shrader v. Biddinger, 633 F.3d 1235, 1242 n.5 (10th Cir. 2011). Recognizing the difficulty inherent in conducting a jurisdictional analysis in the context of internet activities, which are "peculiarly non-territorial," the Tenth Circuit recently noted in *Shrader v. Biddinger* that the personal jurisdiction analysis in internet contexts must be adapted "by placing an emphasis on the internet user or site *intentionally directing* his/her/its activity or operation *at* the forum state rather than just having the activity or operation accessible there."  *Id.* at 1241 (emphasis original).  In *Shrader*, the court utilized the following test for specific jurisdiction in an internet context:

> [A] state may, consistent with due process, exercise judicial power over a person outside of the State when that person (a) *directs electronic activity into the State*, (2) *with the manifested intent of engaging in business or other interactions within the state*, and (3) that activity creates, in a person within the State, a potential cause of action cognizable in the State's courts.  Under this standard, a person who simply places information on the Internet does not subject himself to jurisdiction in each State into which the electronic signal is transmitted and received.  Such passive Internet activity does not generally include directing electronic activity into the State with the manifested intent of engaging in business or other interactions in the State thus creating in a person within the State a potential cause of action cognizable in courts located in the State.

*Id.* at 1240-41 (quoting ALS Scan, Inc. v. Digital Serv. Consultants, Inc., 293 F.3d 707, 712 (4th Cir. 2002)).  The court noted that one implication of this test is that simply posting information on the internet, without more, does not "subject the poster to personal jurisdiction wherever the posting could be read."  *See id.* at 1241.  Thus, the Tenth Circuit instructed courts that, when "considering what 'more' could create personal jurisdiction for such activities, courts look to indications that a defendant deliberately directed its message at an audience in the forum state and intended harm to the plaintiff occurring primarily or particularly in the forum state."  *See*

16

*id.*[16]   This court finds that both *Zippo* and *Shrader* provided helpful guidance on the issue of whether POM's maintenance of the ICTV website constitutes a "contact" for purposes of specific contacts-based jurisdiction.

The facts demonstrate that level of interactivity on ICTV's website clearly falls within the "middle ground" described in *Zippo*: the website cannot be classified as passive or interactive to the point that it clearly conducted business over the internet.   Thus, under *Zippo*, the court must analyze the level of interactivity and the commercial nature of the exchange to determine whether the ICTV website is a sufficient connection to Oklahoma for the establishment of personal jurisdiction.   The court finds that the ICTV website is not sufficiently interactive under *Zippo* to provide a basis for personal jurisdiction.

The *Zippo* court noted that the sale of property or services and the entry into contracts with forum residents through the website were factors weighing in favor of finding personal jurisdiction.   *See Zippo*, 952 F. Supp. at 1124-26.   However in the instant case there is no evidence that property or services were sold through the ICTV website, and at no time did POM enter into contracts with Oklahoma residents through the website.[17]   It can be argued that the website does "little more than make information available to those who are interested," (*see id.* at

---

[16] In *Shrader*, the Tenth Circuit was analyzing internet jurisdiction in a defamation lawsuit specifically.   However, there is no indication in *Shrader* that the Circuit intended this method of analysis for internet-based specific contacts apply exclusively in the context of defamation.   The section presenting this analysis is entitled, "Personal Jurisdiction in the Internet Context," and the Circuit's reasoning for the adoption of this distinct analysis rests on the a fact present in all internet jurisdiction cases, primarily, that the internet is distinctly non-territorial and the "untenable result" that would occur if a defendant posting on the internet could be brought to suit in any jurisdiction in which the website could be viewed.   *See Shrader*, 633 F.3d at 1240-41.

[17] Plaintiff submitted evidence demonstrating that POM's contractual relationship with NRHA, a producer of ICTV programming, was instigated after NRHA representatives contacted POM via contact information found on the ICTV website.   This factual scenario is distinguishable from that analyzed and found to support personal jurisdiction in *Zippo*.   In *Zippo*, the defendant website solicited customers from the forum state through its website, entered into contracts with forum residents *through the website*, and forum residents received defendants' services through the website, pursuant to the contract.   Zippo Mfg. Co. v. Zippo Dot Com, Inc., 952 F. Supp. 1119, 1121 (W.D. Pa. 1997) (About 3,000 forum residents "contracted to receive Dot Com's service by visiting its Web site and filling out the application.").   In contrast, the ICTV website merely provided contact information and a link through which ICTV could be contacted.   Though NRHA representatives *contacted* POM through the ICTV website, the *contract* was created by way of personal communication between the parties.

1124), like the foreign defendant over whom the court could not exercise personal jurisdiction in *Bensusan Restaurant. Corp. v. King* (937 F. Supp. 295, 301 (S.D.N.Y. 1996), *aff'd*, 126 F.3d 25 (2d Cir. 1997); *see supra* note 10). The only portion of the website that is potentially "interactive" within the meaning of *Zippo*—the "contact us" link—is only minimally interactive. This link is limited in its interactivity because it merely provides a method for customers to contact ICTV and request ICTV services. POM's limited ability to aid potential viewers of ICTV programming is reflected in the communication between POM and the Oklahoma resident, in which the POM representative merely instructed the Oklahoma resident to contact DirecTV to cure any lapse in reception of ICTV programming. *See supra* note 11. Whatever services the website claimed POM could directly provide, the evidence shows that POM could not itself deliver the ICTV programming to any individual consumer and the email communication was used to simply provide additional information for how a potential ICTV consumer may receive the programming via DISH or DirecTV satellites. *See* Oral Argument Exh. 7 (instructing Oklahoma resident to update his DirecTV equipment and call a DirecTV customer service representative to receive the programming).

Therefore, the court finds that the ICTV website is only minimally interactive under *Zippo*, as it merely provided a method to contact POM via email. Furthermore, the nature of the communication facilitated by the website was not commercial, because the website did not sustain any commercial activity and POM did not have the ability to sell ICTV programming because it was distributed to consumers as a portion of the DISH and DirecTV satellite cable packages. Thus, the *Zippo* test demonstrates that while the ICTV website was not exclusively passive, it provided no interactivity relevant to the jurisdictional analysis.

Applying *Shrader* to the facts of the case, the court finds that, by way of its communication with at least one Oklahoma resident via the website's "contact us" link, POM has "directed electronic activity into" Oklahoma. Thus, the first prong of the test utilized in *Shrader* is fulfilled. *See* 633 F.3d at 1240. The second prong of the *Shrader* analysis inquires whether the defendant manifested an intent to "engage in business or other interactions within Oklahoma." *Shrader*, 633 F.3d at 1240. The court finds that, pursuant to the actual communications undertaken by POM via the ICTV website, POM did not have the intent to engage in business with residents of Oklahoma via the website. As previously stated, POM did not use the website to engage in commercial activity or to enter into contracts with forum residents. Furthermore, because the ICTV programming was "sold" to consumers as a portion of DirecTV and DISH satellite services, POM was unable to sell the ICTV product it promoted via the ICTV website. Any other "interactions" POM had with Oklahoma residents appear to merely supply information in response to inquiries about how one can receive the ICTV programming via satellite. As in the circumstance cited in *Shrader* and the Fourth Circuit's

*ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, merely placing information on the internet does not signify that a person has purposefully directed his activities toward each state in which the information is received. *See id.* at 1241; 293 F.3d 707, 714 (4th Cir. 2002).

Supporting this court's conclusion is *Bensusan Restaurant Corp. v. King*, a trademark infringement case in which a New York federal court determined that it could not exercise personal jurisdiction over a Missouri defendant. *See generally* Bensusan Restaurant. Corp. v. King, 937 F. Supp. 295, 301 (S.D.N.Y. 1996), *aff'd*, 126 F.3d 25 (2d Cir. 1997). In *Bensusan*, the court reasoned that a website posted by defendant did not subject it to personal jurisdiction in New York, despite its accessibility there, because it merely provided general information about

defendant's Missouri jazz club, a list of ticketing outlets, and a phone number for charge-by-phone ticket orders. *See id.* at 297, 301. In the instant case, the ICTV website likewise merely provided information about the channel's programming and how potential consumers could receive such programming. The ICTV website's "contact us" link is analogous to the *Bensusan* defendant's offering of a phone number by which potential customers could request and purchase tickets. While the websites in both *Bensusan* and the instant case transmitted allegedly infringing trademarks into the forum state, that fact in itself is not sufficient for a court to exercise personal jurisdiction over a defendant when the website at issue is generally passive in nature.

The court therefore concludes that POM has not purposefully directed its internet activities toward Oklahoma. Having made this conclusion, it is unnecessary to consider whether Plaintiff's cause of action arose out of POM's internet activities within Oklahoma. *See, e.g., Shrader*, 633 F.3d at 1240-41 (three-pronged test for specific jurisdiction in internet context is stated in conjunctive); *see also* Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d 1063, 1071 (10th Cir. 2008) (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985)) (general test for whether a contact supports personal jurisdiction requires "purposeful direction" of defendant's activities at forum state).[18] POM's maintenance of ICTV's website cannot provide a foundation for specific contacts-based jurisdiction in this case.

---

[18] The third prong of *Shrader*'s three-prong test to determine whether a defendant's internet activity supports specific jurisdiction reflects the general requirement that a specific contact arise out of or result from the defendant's activities in the state. The third prong inquires whether the defendant's "activity creates, in a person within the State, a potential cause of action cognizable in the State's courts." *Shrader*, 633 F.3d at 1240-41. Based on the facts of this case, this requirement is probably minimally met by the fact that the allegedly infringing marks and trade dress were displayed on ICTV's webpage, and therefore observed by any Oklahoma residents who visited the website. Thus, trademark infringement can be argued to have occurred in Oklahoma as a result of ICTV's website, which was maintained by POM. As stated previously, however, this fact alone is insufficient to establish specific jurisdiction in cases where the defendant did not direct its activities toward the forum state. Furthermore, this court finds that even if it could be said that POM purposefully directed its internet activities toward Oklahoma, this establishes only a minimal specific contact with Oklahoma, which is easily overcome by this court's finding that the

(iv)    Contracts with Oklahoma Producers

Fourth, Plaintiff has alleged that POM maintained at least six contractual relationships with Oklahoma entities, including NRHA, BuckVentures, "Hunt, Sleep, Fish Outdoors," Jimmy Houston Adventures, and Hooked on Fishin'.  Most of these contractual relationships appear to involve the production of programming that appeared on ICTV.  The evidence demonstrates that after POM entered into a contractual relationship with these entities, it sent invoices to the entities in Oklahoma and received payments from the Oklahoma entities, drawn from Oklahoma bank accounts.[19]  There is little doubt, and it appears to be undisputed, that POM purposefully availed itself of doing business in Oklahoma when it knowingly entered into contracts with these Oklahoma entities.  *See Burger King*, 471 U.S. at 473, 478-79, 487 (with regard to contractual obligations, "parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities.").  However, though POM can be said to have purposefully availed itself of contractual relationships in Oklahoma, with the exception of the NRHA contract discussed *infra*, there is no evidence that these contractual relationships involved the allegedly infringing marks.  Therefore, it cannot be said that Plaintiff's cause of action arose out of or resulted from POM's contractual relationships with producers of ICTV programming in

---

exercise of personal jurisdiction in this case undermines traditional notions of fair play and substantial justice. *See* OMI Holdings, Inc. v. Royal Ins. Co. of Canada, 149 F.3d 1086, 1092 (10th Cir. 1998) (citing Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 210 (1st Cir. 1994)) (stating that "reasonableness" aspect of jurisdictional analysis is analyzed on a sliding scale; if defendant's contacts with the forum state are weak, "reasonableness" inquiry is less rigorous); *see infra* Part I.A.2.b.

[19] With regard to the fact that POM received checks drawn from Oklahoma bank accounts, the court notes that this identical type of "contact" with a forum state was found to be of "negligible" jurisdictional significance in *Helicopteros Nacionales de Colombia v. Hall*. *See* 466 U.S. 408, 417 (1984) ("Helicol's acceptance from Consorcio/WSH of checks drawn on a Texas bank is of negligible significance for purposes of determining whether Helicol had sufficient contacts in Texas. . . . Common sense and everyday experience suggest that, absent unusual circumstances, the bank on which a check is drawn is generally of little consequence to the payee and is a matter of discretion of the drawer.")

Oklahoma.  Therefore, while the contractual relationships are certainly relevant on the issue of general jurisdiction over defendant, they are irrelevant with regard to specific jurisdiction.

(v)      NRHA Communications & Contract

Finally, the evidence shows that the written communications between POM and the NRHA, an Oklahoma entity, contained the allegedly infringing marks.  *See supra* note 4.  These marks appear on ICTV's business proposal directed to NRHA, programming information material, and the contract signed by both parties.  *See, e.g., id.*  Though NRHA initially contacted POM via the ICTV website (*see* Affidavit of Todd Barden, Supplement to Response to Motion to Dismiss, Exh. E., Docket No. 78-1 at 68-71), the parties engaged in about six months of negotiations prior to entering into a License and Distribution Agreement (*see id.*).  The license and distribution contract was to last for a term of one year and include thirteen original episodes for inclusion with ICTV programming.  *See* POM-NRHA License and Distribution Agreement, Supplement to Response to Motion to Dismiss, Exh. E, Docket No. 78-1 at 75-76.  Performance of the agreement included NRHA's production of programming for ICTV, and ICTV sending invoices to NRHA in Oklahoma for its services.  *See* Affidavit of Todd Barden, Supplement to Response to Motion to Dismiss, Exh. E, Docket No. 78-1 at 70.  POM's conduct through the negotiation, execution, and performance of the contract demonstrates that it reached out beyond its home state of Colorado and created a continuing relationship and obligation with NRHA, a citizen of Oklahoma.  *See* Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985).  Thus, the court finds that POM purposefully availed itself of doing business in Oklahoma when it contracted with Oklahoma entity NRHA.

The first prong of the specific contact test satisfied, the court must next inquire into whether Plaintiff's cause of action arose out of or resulted from POM's contractual relationship

with NRHA.  It is reasonable to assume that the use of the allegedly infringing marks on the communications and contract with NRHA caused a very limited portion of the overall trademark infringement damages claimed to be suffered by Plaintiff. [20]  Furthermore, this case can be distinguished from the majority of contract-based specific jurisdiction precedent.  Typically, when specific jurisdiction is based on a contract or communications with one party in the forum state, the cause of action is for breach of the contract that established the "minimum contact" with the forum state.  For example, in *Burger King*, the Court recognized that a forum state's exercise of personal jurisdiction over an out-of-state defendant may be premised solely on the defendant's contractual relationship with a forum state party without violating due process.  *See generally id.*  Specific jurisdiction existed over the out-of-state defendant in *Burger King* because the cause of action arose from the defendant's breach of the contract which was his only contact with the forum state.  *See id.* at 478-81.  In contrast, though it has been established that POM had an ongoing contractual relationship with NRHA, Plaintiff was not a party to that contract and accordingly has not sued for breach of that contract.  Instead, plaintiff has sued for trademark infringement, and a portion of the allegedly infringing marks appear on the communications and contract with the Oklahoma-based third party.

The court concludes that POM's activities with the Oklahoma-based NRHA supports a finding that these activities constitute a "specific contact" that *may* support personal jurisdiction.  However, due to (a) the limited audience to this display of allegedly infringing marks, and (b) the fact that the display of the marks is collateral to the contractual relationship which fulfills the

---

[20] Due to their display on ICTV promotional materials, communications, and the contract between POM and NRHA, it is reasonable to assume that the allegedly infringing marks were observed by the Oklahoma entity's officers.  These officers could have been misled by the allegedly infringing marks.  However, the court notes that this limited audience for the allegedly infringing marks can result in only a miniscule portion of Plaintiff's overall claim for damages, when you compare the limited size of the NRHA audience with the vast audience capable of viewing the marks as displayed on the broadcast and website of ICTV.

"purposeful availment" prong of specific jurisdiction for this contact, the court further concludes that this specific contact is weak and will likely be overcome by traditional notions of fair play and substantial justice.[21]

                  b.   Traditional Notions of Fair Play and Substantial Justice

Because the court finds that one weak, specific contact exists between POM and Oklahoma, it must now consider whether the exercise of personal jurisdiction pursuant to that contact would "offend traditional notions of fair play and substantial justice."  OMI Holdings, Inc. v. Royal Ins. Co. of Canada, 149 F.3d 1086, 1091 (10th Cir. 1998).  Pursuant to International Shoe Co. v. Washington, any exercise of personal jurisdiction over defendants must "always be consonant with traditional notions of fair play and substantial justice."  Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d 1063, 1071 (10th Cir. 2008) (citing 326 U.S. 310, 316 (1945)).  Thus, once a court has determined that a defendant has "minimum contacts" with the forum state, it must further analyze whether its exercise of personal jurisdiction is reasonable. At this point, the burden shifts to the defendants to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable."  Shrader v. Biddinger, 633 F.3d 1235, 1240 (10th Cir. 2011).

To determine whether the exercise of jurisdiction would be reasonable, the Court must consider "(1) the burden on the defendant, (2) the forum state's interest in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared

---

[21] The Tenth Circuit has recognized that the "reasonableness" prong of the jurisdictional analysis is analyzed on a sliding scale; the stronger the showing of minimum contacts, the less rigorous the "reasonableness" inquiry, and vice versa.  See OMI Holdings, Inc. v. Royal Ins. Co. of Canada, 149 F.3d 1086, 1092 (10th Cir. 1998) (citing Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 210 (1st Cir. 1994)).  Traditional notions of fair play and substantial justice are discussed infra Part I.A.2.b.

interest of the several states in furthering fundamental substantive social policies." *OMI Holdings*, 149 F.3d at 1095 (citing Asahi Metal Indus. Co., Ltd. v. Sup. Court of California, 480 U.S. 102, 113 (1987).  When considering these factors, courts must keep in mind the strength of the relevant contacts, because this prong of the specific jurisdiction "inquiry evokes a sliding scale: the weaker the plaintiff's showing on [minimum contacts], the less a defendant need show in terms of unreasonableness to defeat jurisdiction." *Id.* at 1092 (quoting Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 210 (1st Cir. 1994)).  Thus, due to the weakness of POM's specific contact with Oklahoma, the court finds that POM bears a light burden to prove that the exercise of personal jurisdiction is unreasonable.  Considering this light burden, and the very minimal connection that Oklahoma has to the case in general, the court finds that exercising jurisdiction over POM would violate traditional notions of fair play and substantial justice.

(i)      Burden on Defendant of Litigating in the Forum

Although not dispositive, "the burden on the defendant of litigating the case in a foreign forum is of primary concern in determining the reasonableness of personal jurisdiction." *Id.* at 1096 (citing World-Wide Volkswagon Corp. v. Woodson, 444 U.S. 286, 292 (1979)).  The purpose of this factor is to "prevent the filing of vexatious claims in a distant forum where the burden of appearing is onerous." *Id.*  While this factor is especially strong when the defendant is from another country, defendants may still face heavy burdens when litigating in a distant state within their own country.  There is some burden experienced when a defendant, such as POM, is hailed into a state in which it has very limited contacts, and required to defend against claims when the majority of witnesses and evidence are found in a different state.  However, the court recognizes that defendant's home state of Colorado is not particularly distant from Oklahoma, and courts have upheld the exercise of personal jurisdiction despite much longer distances

separating defendant's home state and the forum state.  *See, e.g.,* Burger King Corp. v. Rudzewicz, 471 U.S. 462, 483-84 (1985) (burden on Michigan defendant forced to litigate in Florida not "so substantial as to achieve *constitutional* magnitude").  Indeed, POM appears to have had little trouble maintaining ongoing business relationships with Oklahoma entities prior to the filing of this case.  *See supra* Part I.A.2.a(iv).  Considering the proximity of POM's home state to the forum state and the technological advances that ease communication across long distances, the court finds that this factor weighs only slightly in defendant's favor.

(ii)  Forum State's Interest in Adjudicating the Dispute

The second factor "examines the forum state's interest in adjudicating the dispute."  *OMI Holdings*, 149 F.3d at 1096.  The Tenth Circuit has noted three ways in which a forum state can be interested in the adjudication of a dispute: (1) "[s]tates have an important interest in providing a forum in which their residents can seek redress for injuries causes by out-of-state actors," (2) states have a "less compelling" interest in adjudicating disputes between two out-of-state parties when the defendant's actions affect forum residents, and (3) states also have an interest when the resolution of the dispute requires the application of the forum state's law.  *See id.* (collecting cases).  The jurisdictional facts herein closely mirror those in *OMI Holdings*, in which the Tenth Circuit had "little trouble" concluding that this factor weighed heavily in favor of the defendant. *Id.*  In the instant case, as in *OMI Holdings*, the court notes that neither party is an Oklahoma entity and resolution of the dispute will not require the application of forum law (as a trademark dispute, it is governed by federal law).  *Id.*  Therefore, the only recognized interest that Oklahoma may have in the instant case is on behalf of Oklahoma residents who are affected by POM's alleged trademark infringement, an interest that the Tenth Circuit has noted is "less compelling."  *See id.* The forum state in *OMI Holdings* had an identical interest, but that interest

26

was insufficient to change the conclusion that this factor weighed heavily in favor of the defendant.  An additional factor noted in *OMI Holdings* and present in the instant case is that "neither party claims that the defendant committed a tortious act against or breach of contract with a [forum state] resident." *See id.* Simply put, the validity of Plaintiff's claim for trademark infringement does not hinge on anything POM did or may be doing in Oklahoma. The court finds that Oklahoma's interest in the adjudication of this dispute is minimal, so this factor weighs heavily in favor of POM.

       (iii) Plaintiff's Interest in Convenient and Effective Relief

  This factor "hinges on whether the Plaintiff may receive convenient and effective relief in another forum." *Id.* at 1097.  This factor may be of great importance in cases in which "the Plaintiff's chances of recovery are greatly diminished by forcing him to litigate in another forum because of that forum's laws or because the burden may be so overwhelming as to practically foreclose pursuit of the lawsuit." *Id.*  Plaintiff is not so endangered in this case.

  In *OMI Holdings*, the Tenth Circuit noted certain facts that convinced it that "Plaintiff may receive convenient relief in an alternative forum." *Id.*  Those facts included evidence that Plaintiff "was a large corporation" that was not incorporated in the forum state, nor did it have its principal place of business in the forum state and, of the witnesses listed by the parties, a minority of them were from the forum state.  *See id.*  Similarly, Plaintiff Outdoor Channel is a corporation incorporated under the laws of Nevada with its principal place of business in California.  Plaintiff has no clear connection to Oklahoma, and has not articulated one.  It is also reasonable to assume that, because the parties are not Oklahoma entities, the majority of witnesses to and physical evidence regarding the trademark infringement claim will be found

with the parties in their respective home states.  These facts indicate that Plaintiff "may receive convenient relief in an alternative forum."  *See id.*

Additionally, the court notes that Plaintiff's relief in this forum is unlikely to be "efficient" or "complete," considering the court's determination, *infra* Part I.B, that POM's co-defendant Robert Sigg is not subject to personal jurisdiction in Oklahoma.  To the extent that Plaintiff would be forced to proceed against POM and Sigg in separate actions across different states, such relief would not be efficient or convenient for the Plaintiff.  The court finds this factor weighs heavily in favor of POM.

(iv)    Interstate Judicial System's Interest in Obtaining Efficient Resolution

This factor "examines whether the forum state is the most efficient place to litigate the dispute."  *See id.*  "Key to this inquiry are [1] the location of witnesses, [2] where the wrong underlying the lawsuit occurred, [3] what forum's substantive law governs the case, and [4] whether jurisdiction is necessary to prevent piecemeal litigation."  *Id.* (internal citations omitted).

The court finds that these factors weigh in favor of POM.  With regard to the first factor, as previously stated, it is reasonable to assume that because the parties are not citizens of Oklahoma, the majority of witnesses and physical evidence will not be located in Oklahoma because the evidence is more likely to be located where the parties conduct their business – California and Colorado.  Considering the third factor, the dispute is governed by federal trademark law, so no state's substantive law will apply to resolve this case.  With regard to the fourth factor, the court actually finds that this court's exercise of jurisdiction will actually promote instead of prevent piecemeal litigation.  As previously noted, the court's determination, *infra*, that the exercise of personal jurisdiction over POM's co-defendant Robert Sigg in

Oklahoma is clearly contrary to due process.  Therefore, retaining jurisdiction over POM in this case would force Plaintiff to instigate a separate action in a different state's court in order to pursue its claim against Sigg.

The second factor presents a more interesting issue.  Due to the national broadcast of the allegedly infringing marks via satellite signal and POM's maintenance of a website containing the allegedly infringing marks, it is difficult to discern where the "wrong underlying the lawsuit occurred."  *See id.*  It is reasonable to assume that a portion of the infringement occurred in each of the fifty states.  However, case law provides some instruction as to where the harm may be focused in an intellectual property case in which the harm may be felt nationwide.  A line of cases beginning with the Supreme Court's *Calder v. Jones* holds that, in defamation and intellectual property cases, the harm is "focused" on the state in which the plaintiff resides.  *See, e.g.,* Calder v. Jones, 465 U.S. 783, 789 (1984); Indianapolis Colts, Inc. v. Metro. Baltimore Football Club L.P., 34 F.3d 410, 412 (7th Cir. 1994) (noting that the "largest concentration of consumers" likely to be confused by the allegedly infringing trademark is in the plaintiff's home state); Zippo Manufacturing Co. v. Zippo Dot Com, 952 F. Supp. 1119, 1127 (W.D. Pa. 1997) ("[S]ince [Plaintiff] is a Pennsylvania corporation, a substantial amount of the injury from the alleged wrongdoing is likely to occur in Pennsylvania.").  Applying the general rule found in these cases, the legal assumption appears to be that the harm resulting from the trademark infringement was based in Plaintiff's home state of California, not Oklahoma.  Considering each of these factors, the court concludes that this dispute is likely to be adjudicated more efficiently in a state other than Oklahoma.  Therefore, this factor again weighs heavily in favor of POM.

        (v)      States Interest in Furthering Fundamental Substantive Social Policies

This factor considers all the states' interest in "advancing fundamental substantive social policies." *See OMI Holdings*, 149 F.3d at 1097. "[A]nalysis of this factor focuses on whether the exercise of personal jurisdiction by [the forum state] affects the substantive social policy interests of other states or foreign nations." *Id.* The parties have not argued that the exercise of personal jurisdiction in Oklahoma would negatively affect the social policy interests of any other state. Moreover, the court has not identified any substantive social policies in other states that would be undermined by an Oklahoma court's adjudication of this matter. This factor therefore weighs in favor of Plaintiff.

An analysis of the reasonableness factors makes clear that an exercise of jurisdiction over POM would offend the traditional notions of fair play and substantial justice. Three of the five factors heavily favor POM. Of the two remaining factors, one slightly favors POM and the other favors Plaintiff Outdoor Channel. Because of its extremely limited contact with Oklahoma, POM was not required to make a strong showing in order to defeat specific personal jurisdiction with this prong. The court finds that the four factors weighing in POM's favor—three of those weighing heavily in its favor—are more than sufficient to overcome the weak specific contact established by Plaintiff. The exercise of specific personal jurisdiction over defendant POM is inappropriate in this case.

<ol start="3" style="list-style-type: none;">
<li>3.     General Jurisdiction</li>
</ol>

Having found that specific jurisdiction over POM does not exist in this case, the court must consider whether general jurisdiction exists. General contacts-based personal jurisdiction is based on all the defendant's contacts with the forum state. OMI Holdings, Inc. v. Royal Ins. Co. of Canada, 149 F.3d 1086, 1091 (10th Cir. 1998) (citing Helicopteros Nacionales de Colombia v. Hall, 466 U.S. 408, 415 (1984)). "However, '[b]ecause general jurisdiction is not related to the

events giving rise to the suit, courts impose a more stringent minimum contacts test, requiring the plaintiff to demonstrate the defendant's 'continuous and systematic general business contacts'" with the forum state.  *Id.* (quoting Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 567 (2d Cir. 1996) (quoting *Helicopteros*, 466 U.S. at 416)).  In *Shrader*, the Tenth Circuit elaborated on the "continuous and systematic" test:

> It should be emphasized that, as we are dealing with general jurisdiction, the commercial contacts here must be of a sort "that approximate physical presence" in the state—and "engaging in commerce with residents of the forum state is not in and of itself the kind of activity that approximates physical presence within the state's borders."

633 F.3d 1235, 1243 (10th Cir. 2011) (quoting Bancroft & Masters, Inc. v. Augusta Nat'l, Inc., 223 F.3d 1082, 1086 (9th Cir. 2000)).  The court will now analyze POM's general business contacts with the state of Oklahoma to determine whether Plaintiff has satisfied the "high burden" of demonstrating that POM had continuous and systematic general business contacts with Oklahoma.  *See* Benton v. Cameco Corp., 375 F.3d 1070, 1081 (10th Cir. 2004).

At the outset, the court must define which contacts asserted by Plaintiff are relevant for purposes of general jurisdiction.  Pursuant to the considerations discussed *supra*, the court finds that (a) the nationwide broadcast of ICTV and Performance Television channels via DirecTV and DISH[22] and (b) the potential infomercial revenue are not "general business contacts."  This finding is primarily based on the fact that, with regard to these contacts, POM has not undertaken

---

[22] The existence of the "Performance Television" channel is the jurisdictional fact alleged in Plaintiff's Motion for Sanctions.  It is pertinent only to general jurisdiction because there are no allegations that it displayed the allegedly infringing marks in its programming, thus the lawsuit cannot be said to have arisen out of or resulted from the activity of POM in broadcasting Performance Television via DirecTV. As discussed *supra*, the court has found that POM had not purposefully directed any contact toward Oklahoma by way of the DISH and DirecTV broadcast of ICTV, and the court finds the same analysis applies to DirecTV's broadcast of Performance Television.  There is simply nothing in the contracts between POM and DISH or DirecTV, or in the conduct of those parties, that creates a contact for purposes of personal jurisdiction analysis, in either the specific or general jurisdiction contexts.

any direct contact with Oklahoma.  *See supra* discussion Part I.A.2.a.(i) and (ii).[23]  Thus, these two contacts are irrelevant for purposes of general jurisdiction.

For similar reasons, the court also finds that the ICTV website does not constitute a contact relevant to the issue of whether POM maintained continuous and systematic business contacts in the state.  As the court has already noted, the ICTV website did not engage visitors in any form of commercial activity; it provided no opportunities for visitors to enter into contracts or commercial transactions.  Instead, it passively provided contact information and links, general information, and advertisements (such as real estate listings).  In *Shrader*, the Circuit noted that the defendant's operation of a website *can* subject the defendant to general jurisdiction in the forum state, but the propriety of general jurisdiction would depend on the "nature and degree of commercial activity with the forum state."  633 F.3d at 1243.  Further, the point at which sustained commercial activity over a website triggers general jurisdiction has been set very high by courts.  *See id.*[24]  The evidence demonstrates, and the court has already found, that the ICTV website was not a means of conducting commercial activities in any state, let alone Oklahoma.  It simply creates no contacts with Oklahoma relevant to either the specific or general jurisdictional analysis.[25]

---

[23] With regard to general jurisdiction, there is nothing in the contracts or broadcasts of the television channels via satellite demonstrating that POM is doing business in the forum state such that its activities approximate a physical presence in Oklahoma.  POM sells nothing to the residents of Oklahoma by way of the DirecTV or DISH signals—Oklahoma residents purchase from DirecTV or DISH packages of channels which may include the ICTV or Performance Television channels created by POM.

[24] The *Shrader* court collected cases citing different points at which the level of commercial activity through a website in the forum state created general jurisdiction.  *See* 633 F.3d at 1243 (*comparing, e.g.,* ESAB Group, Inc. v. Centricut, Inc., 126 F.3d 617, 623-24 (4th Cir. 1997) ("holding 4,666 internet domain-name registrations, specifically analogized to sales, insufficient for general jurisdiction") *with* Gator.Com Corp. v. L.L. Bean, Inc., 341 F.3d 1072, 1080 (9th Cir. 2003) ("finding general jurisdiction based in part on 'millions of dollars in sales, driven by extensive, ongoing and sophisticated sales effort involving large numbers of direct email solicitations and millions of catalog sales.'").  The cases cited in *Shrader* demonstrate that the standard for internet contacts-based general jurisdiction is set very high, much higher than anything Plaintiff has even alleged to have occurred via the ICTV website in the instant case.

[25] A comparison of the instant case to the facts of *Shrader* further supports the court's conclusion.  In *Shrader* the plaintiff had (1) "*purchased* books, courses, and a data feed from [the website]," (2) another individual had

Thus, the contacts left for consideration in this general jurisdiction analysis are POM's contractual relationships with Oklahoma entities. The evidence demonstrates that POM contracted with at least six of these Oklahoma entities, including NRHA, BuckVentures, "Hunt, Sleep, Fish Outdoors," Jimmy Houston Adventures, and Hooked on Fishin'. Through these contractual relationships, POM received programming for ICTV, sent invoices to these Oklahoma entities, and received payments drawn from Oklahoma bank accounts.[26] These contractual relationships demonstrate that POM conducted business in Oklahoma. The question therefore becomes whether these contacts were continuous and systematic in such a way that they approximated a physical presence in the state of Oklahoma. *See Shrader*, 633 F.3d at 1243; Bancroft & Masters, Inc. v. Augusta Nat. Inc., 223 F.3d 1082, 1086 (9th Cir. 2000).

The Supreme Court has ruled multiple times on the issue of whether certain contacts presented to the Court establish general jurisdiction. Two noteworthy cases on this topic are *Perkins v. Benguet Consol. Mining Co.* and *Helicopteros Nacionales de Colombia v. Hall*. In *Perkins*, the court held that an Ohio court could exercise general personal jurisdiction over the defendant, a foreign company, whose president had relocated to Ohio and "ha[d] been carrying on in Ohio a continuous and systematic, but limited, part of [the defendant company's] general business." 342 U.S. 437, 438, 445 (1952). The defendant-company's operations in Ohio included the holding of directors' meetings in the company office in Ohio, completing company correspondence, and distribution of salary checks drawn from Ohio bank accounts (*id.* at 445); essentially, the president was operating the company from Ohio. In *Helicopteros*, the Court

---

purchased a book from the website, and (3) the website advertised a magazine which was available for purchase in a Tulsa bookstore. 633 F.3d at 1244 (emphasis supplied). The Tenth Circuit found these contacts via the website "clearly insufficient to warrant the exercise of general personal jurisdiction . . . ." *Id.* In contrast, there is no evidence that the ICTV website made *anything* available for purchase by Oklahoma residents.

[26] *See supra* note 19 (noting that receipt of payment drawn from forum state's bank account is irrelevant for purposes of jurisdictional analysis).

compared the activities of the defendant to those of the foreign defendant in *Perkins* to determine whether the *Helicopteros* defendant had sufficient minimum contacts with the state of Texas to justify general jurisdiction.  *See* 466 U.S. 408, 416 (1984).  The Court noted that the defendant's contacts with Texas "consisted of sending its chief executive officer to Houston for a contract-negotiation session; accepting into its New York bank account checks drawn on a Houston bank; purchasing helicopters, equipment, and training services from Bell Helicopter for substantial sums; and sending personnel to Bell's facilities in Fort Worth for training."  *Id.*  After analyzing these contacts, the Court found they were insufficient to support general jurisdiction in the state of Texas.  *See id.* at 416-19.

This court finds that the nature of POM's business contacts in Oklahoma better reflect the general contacts noted by the Supreme Court in *Helicopteros* than those found in *Perkins*.  POM has about six ongoing contracts with Oklahoma entities.  This is substantially less activity in the forum state than in *Perkins*, wherein the defendant essentially conducted all of its business from the forum state.  It appears that POM received programming from Oklahoma entities in Colorado, and then sent invoices into Oklahoma from Colorado.  While there is some evidence that POM executives offered to travel into Oklahoma to negotiate a contract, there is no evidence that this travel actually occurred.  *See* Affidavit of Todd Barden, Supplement to Response to Motion to Dismiss, Exh. E., Docket No. 78-1 at 68-71.  There is little evidence to show that POM representatives ever left the state of Colorado while conducting their out-of-state business with these Oklahoma entities; most of the correspondence appears to have been completed via email.  In contrast, representatives and personnel from the defendant in *Helicopteros* actually visited Texas to negotiate contracts and receive training necessary for their jobs, yet this type of

contact was found to be insufficient to establish general jurisdiction in the context of

*Helicopteros*.

Additionally, the *Helicopteros* defendant maintained at least one ongoing contractual

relationship with a Texas entity, and that contact was also found to be insufficient to support

general jurisdiction.  In the instant case, POM has at least six ongoing contractual relationships

with Oklahoma entities, which the court recognizes is a higher number than that considered in

*Helicopteros*.  Nevertheless, the court finds that POM's contacts with Oklahoma entities closely

reflect the nature of the contacts found to be insufficient in *Helicopteros*, and accordingly finds

that POM's maintenance of these contractual relationships does not create systematic and

continuous activities in Oklahoma such that POM's activities approximate a physical presence in

this state.

The Tenth Circuit lists four factors courts may consider when assessing a defendant's

contacts with the forum state for the purposes of general jurisdiction.  Those factors are: (1)

whether the defendant solicits business in the forum state through a local office or agents, (2)

whether the defendant sends agents into the forum state on a regular basis to solicit business, (3)

the extent to which the defendant holds itself out as doing business in the forum state through

advertisements, listings, or bank accounts, and (4) the volume of business the defendant conducts

in the forum state.  Doering v. Copper Mountain, Inc., 259 F.3d 1202, 1210 (10th Cir. 2001)

(citing Kuenzle v. HTM Sport-Und Freizeitgerate AG, 102 F.3d 453, 457 (10th Cir. 1996)).

Applying these factors to the instant case, the court initially notes that there is no

evidence that POM maintained a local office or agents in Oklahoma or that it regularly sent

agents into Oklahoma to solicit business.  Therefore, the first two factors are not fulfilled.  With

regard to the third factor, the court notes that there is no evidence that POM ever maintained an

bank account in Oklahoma, and in fact, defendant Sigg's Declaration denies such activity. *See* Motion to Dismiss, Exh. 1, Docket No. 22. The only evidence that it maintained advertisements or listings in Oklahoma is through the ICTV website, which was available worldwide for viewing and contained information about the ICTV programming and a "contact us" link, as previously discussed. This does not form a substantial connection to the forum state such that it could be argued that POM held itself out as doing business in Oklahoma. The fourth factor considers the amount of business that POM conducts in Oklahoma. With regard to this factor, the court finds the relevant business is POM's contractual relationships with Oklahoma entities. The court has already found these business contacts are insufficient to establish general jurisdiction under *Helicopteros*. The evidence simply does not support a finding that POM is subject to general contacts-based jurisdiction in Oklahoma.

The court therefore finds that it cannot exercise personal jurisdiction over POM, in that Plaintiff has not established a prima facie case that POM maintained sufficient minimum contacts with the state of Oklahoma such that personal jurisdiction would be proper. Therefore, Defendants' Motion to Dismiss is GRANTED with regard to Defendant Performance One Media, LLC.

B.      Personal Jurisdiction over Defendant Robert Sigg

Plaintiff has produced no evidence that Defendant Sigg has contacts with Oklahoma. In contrast, Sigg attached a signed declaration in which stated that (a) he is a resident of Colorado, and (b) that he owns no real or personal property in Oklahoma, and (c) he does not do business in Oklahoma or maintain any employees in Oklahoma. *See id.* Plaintiff appears to make two arguments to establish the court has personal jurisdiction over Sigg.

First, Plaintiff appears to argue that POM's Oklahoma contacts, discussed above, can be imputed to Sigg, the president of POM.  This is simply untrue.  The "fiduciary shield doctrine" has been adopted by the Tenth Circuit and stands for the proposition that an organization's jurisdictional acts cannot be attributed to the individual officers of that organization.  *See* Ten Mile Indus. Park v. W. Plains Serv. Corp., 810 F.2d 1518, 1527 (10th Cir. 1987).

> Where the acts of individual principals of a corporation in the jurisdiction were carried out solely in the individuals' corporate or representative capacity, the corporate structure will ordinarily insulate the individuals from the court's jurisdiction.  Jurisdiction over the representatives of a corporation may not be predicated on jurisdiction over the corporation itself, and jurisdiction over the individual officers and directors must be based on their individual contacts with the forum state.

*Id.*  Under this rule, POM's contacts with Oklahoma cannot be attributed to Sigg as an individual.  Plaintiff therefore bears the burden of showing the Sigg had individual contacts with Oklahoma, and it has not.

Second, Plaintiff argues that Sigg acted independently, and not on behalf of POM, when he attempted to register two of the allegedly infringing marks at issue in this case.  While Sigg's independent action of attempting to register the allegedly infringing trademarks may not fall under the fiduciary shield doctrine, the court finds that it is irrelevant for purposes of personal jurisdiction.  Sigg's failed attempt to register two allegedly infringing trademarks does not have any relationship to Oklahoma whatsoever.  Thus, the court cannot conclude on this grounds that Sigg purposefully directed his activities at Oklahoma residents.

Simply put, Plaintiff makes no arguments or allegations that link Sigg to Oklahoma for purposes of personal jurisdiction.  Therefore, Plaintiff has not met its burden of establishing a prima facie case that personal jurisdiction exists over defendant Sigg in Oklahoma.  The court

holds that Sigg is not subject to personal jurisdiction in Oklahoma.  Therefore, the Motion to

Dismiss for lack of personal jurisdiction is GRANTED with regard to Defendant Robert Sigg.


II.     Plaintiff's Motion to Amend

        The court has considered all the evidence submitted by Plaintiff in support of personal

jurisdiction over Defendants, yet is unable to find that personal jurisdiction exists over the

defendants in Oklahoma.  Therefore, the court finds that additional amendment of the Amended

Complaint in order to further develop facts in support of personal jurisdiction is futile.[27]  As the

court has already considered those facts in this opinion, Plaintiff's Motion to Amend is MOOT.


III.    Plaintiff's Motion for Sanctions

        Plaintiff's Motion for Sanctions is premised on the notion that Defendants' counsel did

not timely produce evidence relating to a contract between POM and DirecTV for the nationwide

broadcast of "Performance Television," and infomercial channel produced by POM.  The

contract and broadcast of Performance Television predated the filing of the instant case.  Plaintiff

claims that this contract is relevant to the general jurisdiction analysis and fell within the scope

of discovery both requested by Plaintiff and ordered to be produced by the magistrate judge.

After recounting what it considers to be defense counsel's ongoing attempts to "conceal essential

facts" (*see* Motion for Sanctions at 3-14, Docket No. 177), Plaintiff requests sanctions in the

form of (a) striking POM's jurisdictional defense based on lack of personal jurisdiction, and (b)

---

[27] The district court in *Shrader* made this same finding: "The [district] court concluded that further amendment of the complaint would be immaterial in that [plaintiff's] response to the defendants' pending motions to dismiss would show whether he could re-frame his pleadings so as to forestall dismissal.  If so, amendment could then be permitted; if not, amendment would be futile."  Shrader v. Biddinger, 633 F.3d 1235, 1238 (10th Cir. 2011).

ordering Defendant to pay Plaintiff's attorney fees incurred in the litigation of the Motion to

Dismiss for lack of personal jurisdiction (*see id.* at 17-20).

Though it recognizes that it has "very broad discretion to use sanctions," the court

declines to sanction Defendants in this case. *See* Matter of Baker, 744 F.2d 1438, 1440 (10th Cir.

1984). There is a strong preference in the Tenth Circuit to "decide cases on their merits." *See*

Lee v. Max Intern, LLC, 638 F.3d 1318, 1321 (10th Cir. 2011). Granting a sanction requested by

Plaintiff—that the court strike Defendants' jurisdictional defenses—would essentially preclude

the court from deciding the personal jurisdiction issue on the merits. Such action should only be

taken in response to egregious violations of discovery orders, as occurred in *Lee v. Max Intern,*

*LLC*. *Id.* (holding that the district court's "considerable discretion" to use sanctions was not

abused when district court dismissed case after the litigant "disobeyed two orders compelling

production of the same discovery materials in its possession, custody, or control" after being

given "no fewer than three chances to make good their discovery obligation" and had failed to do

so at all three turns).

The court finds that Defendants' counsel did not violate the rules in this manner. Though

Defendants forcefully contested the production of contracts between POM and the satellite

providers, such activity does not violate discovery rules. Upon being ordered to produce the

contracts, Defense counsel produced the DirecTV and DISH contracts related to ICTV and

informed both the court and Plaintiff's counsel that the POM had an additional, but unrelated

contract with DirecTV for the broadcast of Performance Television. *See* Motion for Sanctions ¶

15, Docket No. 177. Contrary to Plaintiff's contention that it was unaware of this evidence prior

to oral argument on May 25, 2011,[28] a letter sent to both the magistrate judge and Plaintiff's

---

[28] Referring to the contract between POM and DirecTV for the broadcast of Performance Television, the introduction to Plaintiff's Motion for Sanctions states, "After the May 25, 2011 oral argument concerning personal

counsel disclosed the existence of the contract on April 11, 2011.  Moreover, the disputed contract itself was actually *sent* via email to Plaintiff's counsel (although inadvertently) on April 22, 2011—over one month prior to oral argument on the motion to dismiss.  *See id.* at 10-12. The actions of defense counsel do not rise to a level warranting the severe sanctions requested by Plaintiff.

After reviewing all of Plaintiff's allegations of misconduct against defense counsel, the court finds that sanctions are not appropriate in this matter.  Therefore, Plaintiff's Motion for Sanctions is DENIED.

CONCLUSION

For the reasons stated herein, Defendants' Motion to Dismiss is GRANTED, Plaintiff's Motion to Amend is MOOT, and Plaintiff's Motion for Sanctions is DENIED.

James H. Payne
United States District Judge
Northern District of Oklahoma

---

jurisdiction, Plaintiff learned of additional, jurisdictionally significant contacts between Defendants and Oklahoma." Motion for Sanctions at 1, Docket No. 177.